**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| DeShawn Gardner,<br><br>Plaintiff,<br><br>v.<br><br>Sgt. Carter, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 23 C 0015<br><br>Hon. Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Former Illinois prisoner DeShawn Gardner brought this *pro se* civil rights action, 42 U.S.C. § 1983, claiming that Cook County Sheriff's employees subjected him to excessive force and denied him medical attention when he was temporarily remanded to the custody of the Cook County Department of Corrections in August 2022. Now before the Court are all Defendants' motions for summary judgment, dkts. 107, 110, 112, to which Gardner has responded, dkts. 131-133. For the reasons set forth below, the motions are granted.

**Background**[1]

At all relevant times, Gardner was serving a sentence that dated back to 1998 in the custody of the Illinois Department of Corrections ("IDOC"). Dkt. 111, Defs.' Stmt. of Material Facts ("DSMF") ¶ 1. Gardner was periodically transported to the Cook County Department of Corrections ("CCDOC") and then returned to IDOC custody. DSMF ¶ 2. Defendants Sgt. Carter, Officer Parker, Officer Bracy, Officer Meraz, and Officer Medrano ("Officer Defendants") and Nurse Smith were employed by the Cook County Sheriff's Office as correctional personnel at the Cook County Department of Corrections during the relevant period.

Prior to the incident in question, on August 31, 2022, Gardner attended a court hearing and was thereafter remanded to the custody of the CCDOC. DSMF ¶ 4. Gardner arrived at the CCDOC on August 31, 2022 and completed the intake process. DSMF ¶ 5. Gardner was approximately six

---

[1] There are three summary judgment motions pending. Dkts. 107, 110, 112. Gardner responded to each with its own filing. Dkts. 131-133. Each of these three filings contains a statement of additional facts and a memorandum of law. Because Gardner has not properly responded to any Defendants' LR 56.1 factual statements, (dkts. 109, 111, 113), the Court will accept them as true to the extent supported by the record. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Although the Court is entitled to demand strict compliance with Local Rule 56.1, *see Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x. 642, 643 (7th Cir. 2011) (unpublished), it will generously construe the facts identified by Gardner in his response to the extent they are supported by the record or he could properly testify to them. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (courts may construe *pro se* submissions leniently). The Court notes, in any event, that the record largely consists of video evidence depicting the incident. The Court also is mindful that failure to strictly comply with Local Rule 56.1, or indeed to respond at all to a motion for summary judgment, does not automatically warrant judgment in favor of the moving party. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (moving party has "ultimate burden of persuasion" to show entitlement to judgment as a matter of law).

feet tall and weighed 237 pounds. DSMF ¶ 6. Classification assigned Gardner to Division 5, Tier 2C, Cell 14. DSMF ¶ 7. Gardner arrived on Tier 2C at approximately 10:30 p.m. DSMF ¶ 8.

Defendant Bracy received Gardner in the interlock to Tier 2C. DSMF ¶ 9. At approximately 10:34 p.m., while securing other inmates in their cells, Bracy opened the door to Gardner's assigned cell, and Gardner refused to enter. DSMF ¶ 10. Gardner did not know his assigned cellmate and had not seen him before. DSMF ¶ 11. Gardner stated that he had decided he would not accept any cellmate and wanted to speak with mental health. DSMF ¶ 12. Bracy radioed his supervisor, and Gardner sat on a bench in the dayroom while Bracy secured other detainees. DSMF ¶ 13.

*Incident*

Unless otherwise noted, the evidence submitted in support of the following factual statements consists of two video recordings of the incident, one from the dayroom camera and one from Sgt. Carter's bodywarn camera, which the Court has viewed. *See* Dkt. 111, Ex. 7: Division 5 Tier 2C Dayroom Camera 2022-08-31 and Ex. 8: Sgt. Carter's Body Warn Camera.

At approximately 10:42 p.m., Sgt. Carter and Officers Medrano, Meraz, and Parker arrived on the tier. Gardner was sitting on a bench with his back against a table. Sgt. Carter spoke with Gardner to try to de-escalate the situation. Sgt. Carter asked Gardner what was going on, and Gardner told him that he has not had a cell mate or been around people for 17 years, and that he was at the jail for only a few months on a court writ. Gardener told Sgt. Carter to accommodate him with a single cell or place him in segregation. Gardner reiterated repeatedly that under no circumstances would he take a cellmate while at the CCDOC. Gardner stated, for example, "let's get this really clear, under no circumstances am I taking a cellie in this institution. That's not gonna happen." Sgt. Carter informed Gardner that he was required to accept the assignment that the classification department had given him. Sgt. Carter explained that segregation was not an option. Gardner continued to refuse and repeatedly requested to be sent to segregation. One officer advised Gardner that segregation was not single housing. Gardner made statements about possibly "fighting his cellies" if he were not accommodated. Sgt. Carter again directed Gardner to accept the housing assignment and indicated that the issue could be revisited the next day, but Gardner continued to refuse.

At that point, Sgt. Carter then ordered officers to escort Gardner to his cell. Officers Parker and another officer stepped forward towards Gardner to begin the escort. As Officers Parker and the other officer attempted to gently take a hold of Gardners' arms to escort him, Gardner snatch his own right arm away, and with his left arm swatted Officer Parker's arm away. Officers Parker, Medrano, and Meraz then attempted to gain control of Gardner as he slid away from the officers on the bench and then onto the floor in the narrow space between the bench and the tier wall. In that confined area, the officers struggled for a few seconds to try to gain control of Gardner. Sgt. Carter ordered the officers to "disengage". The officers disengaged by stepping back away from Gardner. Gardner then stood up, and Officer Parker swung his arm and struck Gardner once on the head, which caused Gardner to stumble back against the railing at the edge of the dayroom. Sgt. Carter then deployed two consecutive bursts of OC spray, which together lasted two seconds total, in Gardner's direction. Sgt. Carter ordered Gardner to get down. Gardner laid down on the ground

and allowed officers to secure him in handcuffs behind his back. This entire incident lasted about seven seconds.

The Officer Defendants other than Sgt. Carter then, on Sgt. Carter's order to "decontaminate him", immediately escorted Gardner into the tier's shower area, which was directly adjacent to where the incident had occurred. Sgt. Carter was standing outside the shower doorway with his bodycam running. The shower area was unlit and dark, but Gardner can still be seen under the water, at times kneeling and later standing. There were some moments when Sgt. Carter stepped slightly to the side of the doorway (he was coughing), so there is no view into the shower at those moments, but the water can be heard running from outside the shower doorway for about 25 seconds. The footage then shows Sgt. Carter order the other officers to take Gardner out, and he is seen escorted out of the shower area by the Officer Defendants. His uniform had large visible wet patches that began at his neck and went down his uniform. The Officer Defendants then escorted Gardner off the tier and down the hallway to the dispensary. During that escort, Gardner can be heard saying, "there is shit in my eyes" and "I need help". One officer responded that they, "were almost there", and Sgt. Carter said they were "getting [him] medical attention". According to Gardner, the water from the shower hit his chest and ran all the way down, but did not hit his face and eyes. Dkt. 133, Pl.'s Resp. ("PRESP1") ¶ 10; DSMF, Ex. 1 at pg. 38.

*Post-Incident*

Some of the post-incident events are preserved on video, and others are not. Where the facts below are depicted on video, this is noted. Gardner testified that in the dispensary, in the presence of multiple individuals, including nurses and mental-health staff, he yelled for help breathing and requested that chemicals be flushed from his eyes. Dkt. 113, Def. Smith Stmt. of Material Facts ("DSMF-Smith") ¶ 7.

Nurse Smith attended to Plaintiff in the dispensary and took his blood pressure. DSMF-Smith ¶ 8. Gardner testified that he told her that he was having trouble breathing and that the pepper spray was burning his eyes. Dkt. 114, Smith Mem. at Ex. 1, pg. 40. According to Gardner, she did not say anything in return. *Id.* According to Gardner, Nurse Smith did not flush his eyes. Dkt. 132, P. Resp. to Def. Smith ("PRESP2), ¶ 3. Plaintiff testified that she got a cup of water and held it out for Gardner to bend down and put his eyes in. DSMF-Smith ¶ 10. He further testified, his eyes did not reach the water, and he was unable to pour the water on his face because he was handcuffed, and no person assisted him or gave him additional water. Dkt. 114, Smith Mem. at Ex. 1, pg. 42-43.

Nurse Smith's medical record states that she evaluated Gardner after his complaint of exposure to OC spray, noted no visible injuries, and documented that he reported a burning sensation consistent with OC exposure and that he had been instructed to try and relax so the burning sensation would lessen. DSMF-Smith ¶ 9; PRESP2 at Ex. 3.

After Gardner was cleared from the dispensary, additional video footage shows that Officers Parker and Meraz escorted Gardner out of the dispensary and secured him on a bench in the hallway outside the dispensary. Dkt. 111, Ex. 9, Post-Incident Interview. The following facts in this paragraph are from the Court's review of that video footage. Gardner's right hand was

secured loosely to the wall, and his left hand was free. Gardner was squinting at times and swaying slightly; he also blew his nose once with tissue that he had in his hands. Sgt. Carter then conducted a post-incident interview with Gardner. He told Sgt. Carter that he believed the use of mace was "unnecessary". Sgt. Carter asked Gardner if he was decontaminated, and Gardner said "no . . . because my eyes are still burning". Sgt. Carter responded that Gardner had received a decontamination shower on the tier. Gardner confirmed for Sgt. Carter that he was taken to the dispensary following the incident, but he said that medical personnel there did not "clean his eyes out". When Sgt. Carter asked Gardner if he had anything additional to say, Gardner responded that he, "had a lot to say". He then spoke animatedly for an additional minute, telling Sgt. Carter that forcing him to accept a cellmate was unreasonable and that his being around people was "abnormal behavior" to him. Finally, Gardner again insisted that he would not accept a cellmate and the interview concluded.

Gardner testified that he remained with one hand secured in the hallway for approximately six hours. DSMF ¶ 38. At some point during that period, an officer provided Gardner with a clean CCDOC uniform. DSMF ¶ 39. Before that time, according to Gardner, his clothes were wet and soiled with pepper spray. PRESP1 ¶ 13. Gardner did not see any of the named Defendants after he was secured in the hallway and the post-incident interview concluded. DSMF ¶ 40. After approximately six hours, Gardner was escorted back to a cell on Division 5, Tier 2C; the cell had a sink. DSMF ¶¶ 41-42.

Gardner stated that he did not sustain physical injuries from the incident other than discomfort from OC spray exposure. DSMF ¶ 43. Gardner further stated that the discomfort lasted approximately one week and that the water available in his cell did not alleviate the discomfort. DSMF ¶¶ 44-45. Following the incident, the Cook County Department of Corrections disciplined Gardner, assigned him to 29 days in segregation, and classified him as a staff assaulter. DSMF ¶ 45.

## Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine when a genuine dispute of material fact exists, the Court must assess the evidence in the record as presented in depositions, documents, affidavits or declarations, and other materials. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992).

The party seeking summary judgment bears the initial burden of showing the grounds for his motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once he has done so, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). "A genuine issue of material fact exists only if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The Court must construe all facts in the light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *Nat'l Athletic Sportswear, Inc. v. Westfield*

*Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). "A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Id.* However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture," *Grant v. Trs. Of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (cleaned up).

Additionally, when the events in question were preserved on video, the court must view the facts "in the light depicted by the videotape," provided that "[t]here are no allegations or indications that th[e] videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." *Jones v. Anderson*, 116 F.4th 669, 677 (7th Cir. 2024) (quoting *Scott v. Harris*, 550 U.S. 372, 378, 381 (2007)). *There are no such allegations in this case, so the Court will view the facts in the light depicted by the videotaped evidence, without favoring the non-movant (Gardner). See Lopez v. Sheriff of Cook Cty.*, 993 F.3d 981, 984 (7th Cir. 2021) (court may "take stock of what the video evidence shows without favoring [the non-movant] where the video contradicts his view of the facts"); *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) ("When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage.").

## Analysis

Following screening under 28 U.S.C. § 1915A, Gardner was permitted to proceed on only two claims, both arising under the Eighth Amendment[2]: (1) an excessive force claim against the Officer Defendants; and (2) a claim for denial of medical care against Nurse Smith. Dkts. 14, 88. The excessive force claim encompasses both the Officer Defendants' uses of force and the manner that the Officer Defendants responded to Gardner's exposure to pepper spray. *Id.* All Defendants have moved for summary judgment on the claims raised against them.

### *A. Excessive Force Claim Against Officer Defendants*

A correctional officer's use of excessive force violates a prisoner's Eighth Amendment right against cruel and unusual punishment. *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). Determining whether force was excessive depends on whether the force "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* The Court must consider whether the evidence supports a reasonable inference of malicious intent. *Whitaker v. Dempsey*, 144 F.4th 908, 922 (7th Cir. 2025). Relevant factors include: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and

[2] Although the alleged events occurred at Cook County Jail, Gardner was a convicted prisoner at the time of these events, who was temporarily remanded to Cook County custody on a court writ. Because Gardner was a convicted prisoner who had been sentenced decades ago, the Eighth Amendment applies. *See Lewis v. Downey,* 581 F.3d 467, 474 (7th Cir. 2009) (Eighth Amendment, rather than due process principles, applies to constitutional claims after sentencing).

(5) any efforts made to temper the severity of a forceful response. *McCottrell v. White*, 933 F.3d 651, 663 (7th Cir. 2019).

In conducting its review, the court may not substitute its own judgment for that of prison officials regarding "the reasonableness of a particular use of force or the existence of arguably superior alternatives." *Whitley v. Albers*, 475 U.S. 312, 322 (1986). Put another way, force "does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Id.* at 319. To survive summary judgment, "the prisoner must have evidence that 'will support a reliable inference of wantonness in the infliction of pain.'" *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004) (quoting *Whitley*, 475 U.S. at 322); *see also Lewis*, 581 F.3d at 476 ("[w]hat matters . . . is the mindset of the individual applying the force"). This subjective inquiry applies any time the use of force is more than *de minimis*. *Id.*

With respect to the use of chemical agents in particular, a correctional officer's use of a chemical agent that is necessary "to subdue recalcitrant prisoners does not constitute cruel and unusual punishment." *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984). The use of chemical agents violates the Eighth Amendment only when a correctional officer uses "mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010) (cleaned up).

The Officer Defendants argue that the factors discussed above weigh heavily in their favor, negating an inference of wanton or malicious intent on the part of any officer. Dkt. 110-1, pg. 7-13; Dkt. 108, pg. 4-7. They emphasize that Gardener refused orders and created a security threat, and that the brief physical struggle and the two-second bursts of pepper spray were proportional responses. They also argue that the latter quelled a longer struggle. Finally, they contend that their response to Gardner's exposure to the pepper spray does not evidence malicious intent because they immediately decontaminated him and facilitated medical attention.

Gardner, for his part, largely insists that there was no need for force because the Officer Defendants should have instead acquiesced to what he views as his reasonable request to be single celled. PRESP1, pg. 18-23. He also contends that the pepper spray was a disproportionate response because he was by then "subdued", and the officers should have instead ordered him verbally to stand and submit to handcuffs. He further contends that video depicts Officer Parker punching him in the face with a closed fist, which Gardner says Parker did without "just cause". Dkt. 131, Pl.'s Resp. to Def. Parker ("PRESP3") ¶ 8. He lastly argues that the Officers' response to his exposure to the pepper spray was malicious because his eyes were not flushed in the decontamination shower and his complaints thereafter that his eyes were burning were ignored. PRESP1, pg. 24-26.

The Court concludes that the Officer Defendants have the better of the argument. For the reasons discussed below, a reasonable jury could not find that any of the Officer Defendants had a malicious intent to harm Gardner during the August 31, 2022 incident.

*1. Physical Struggle and Use of Pepper Spray*

First, viewing the video footage and resolving any remaining factual disputes in Gardner's favor, no trier of fact could reasonably conclude that the Officers' attempts to escort Gardner to his cell and Sgt. Carter's use of pepper spray were not good-faith efforts to restore order. It is undisputed from the video footage – and indeed Gardner acknowledges – that he refused orders to voluntarily accept his cell assignment and then physically resisted an escort to his cell before Sgt. Carter deployed pepper spray. The video depicts the Officer Defendants first calmly and respectfully conversing with Gardner for several minutes and soliciting his cooperation with his cell assignment. He repeatedly told the Officer Defendants, point blank, that he unequivocally refused to accept a cellmate *ever*. Gardner also, in the same conversation, indicated that he may fight any future cellmates. When the Officer Defendants then attempted to stand Gardner up and escort him to his cell by the arms, the video footage depicts that Gardner himself escalated the situation by resisting and struggling with the officers. Gardner snatched one of his arms away from Officer Parker and struck the officer with his other arm. Gardner then slid down the bench and onto the floor to evade the officers, and the struggle continued for a few more seconds when Sgt. Carter told the officers to disengage. All of these circumstances and events infer that the Officer Defendants reasonably perceived a security threat and attempted to gain control of Gardner and ultimately deployed pepper spray in an attempt to restore order, not out of maliciousness. *See Jackson v. Angus*, 808 F. App'x 378, 382 (7th Cir. 2020) (finding district court correctly found that there was no factual dispute on excessive force claim where "video footage show[ed] that tactical team officers used two short bursts of pepper spray on Jackson only after he disobeyed three direct orders to come out of his cell"); *Soto*, 744 at 1271 (no wanton and unnecessary force where "chemical agent was used for failure of the inmate to obey a direct order and the use of mace was a reasonable response to the institution's legitimate security concern").

Gardner's main argument in response to these points is that it was the Officer Defendants who created the need for force because they refused his request to be single celled, even in segregation. Gardner contends that the request was feasible, reasonable, and should have been honored given his history of being segregated for so long in IDOC custody. PRESP1, pg. 18-23.

Garnder's position is essentially that he was entitled to disregard Defendants' orders because they were improper. That reasoning is premised on a fundamental misunderstanding of the law. Inmates must comply with orders because their failure to do so places correctional officers and other inmates in danger. *Lewis*, 581 F.3d at 476 ("Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them."). When an inmate "'cannot be persuaded to obey [an] order, some means must be used to compel compliance' because discipline in a correctional institution is 'essential if the prison is to function.'" *See Burton v. Ruzicki,* 258 Fed.Appx. 882, 885 (7th Cir. 2007) (quoting *Soto,* 744 F.2d at 1267). Plaintiff's own belief that he was entitled to single housing does not justify his failure to obey. *See Huff v. Tabler*, No. 3:18-CV-122, 2019 WL 3499494, at *2–3 (N.D. Ind. July 31, 2019) (rejecting plaintiff's argument that he was entitled to disobey order to return to his cell because he was entitled to an hour out of his cell) (detainee context). As the court observed in *Huff*, inmates "cannot be allowed to disobey orders based on their personal understanding of constitutional law, and, when detainees refuse to disobey orders, jail officials have limited options at their disposal to maintain discipline and security." *Id.* at *3.

The Court next finds that, having reasonably perceived a need for force, Sgt. Carter's short (two seconds) two consecutive bursts of pepper spray were also proportional to the gravity of the threat. The pepper spray quelled the ongoing physical struggle and tempered further physical injury that could have resulted. The Seventh Circuit has repeatedly recognized that in certain situations, "pepper spray [can be] less intrusive than, and likely preferable to, a physical struggle to control [a prisoner]". *Whitaker v. Dempsey*, 144 F.4th 908, 923–25 (7th Cir. 2025) (finding that a "short burst of pepper spray" was proportional and "preferable" to continued physical struggle where prisoner was bleeding); *Padula v. Leimbach*, 656 F.3d 595, 603 (7th Cir. 2011) (arrestee context) ("pepper spray is generally of limited intrusiveness" and can be "a very reasonable alternative to escalating a physical struggle with an arrestee") (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002)). Here multiple officers were struggling to control Gardner on the ground in a tight and awkward space between the bench and tier wall when Sgt. Carter ordered them to disengage and used pepper spray. This promptly ended the ongoing physical struggle, resulting in no physical injury (aside from the exposure to the pepper spray) to Gardner. Sgt. Carter followed up the bursts of pepper spray with loud and clear orders for Gardner to lay down on the ground. Because Gardner immediately complied with these orders, officers applied no additional force because no additional force was necessary. The fact that the pepper spray successfully quelled a physical struggle and tempered Gardner's injuries demonstrates proportional force. These factors too tend to negate maliciousness on Sgt. Carter's or the other officers' parts.

Gardner asserts that, at the time Sgt. Carter ordered the officers to disengage, he was "subdued". He contends that Sgt. Carter should have ordered him to stand so he could be handcuffed (rather than pepper sprayed). PRESP1 ¶¶ 8-9, pg. 24. This argument is not compelling.

First, that Gardner was "subdued" and could have been ordered to stand and would submit to handcuffs without further struggle is not a reasonable interpretation of the video footage. The video depicts the officers still struggling to gain control over Gardner on the floor. The Court will not credit Gardner's assertions belied by actual video evidence. *See, e.g., Johnson v. Moeller*, 269 Fed. App'x 593, 596 (7th Cir. 2008) (summary judgment upheld for defendant on excessive force claim where security-camera footage belied plaintiff's version of events).

Second, even if, *for the sake of argument*, the Court credits Gardner that he *felt* subdued on the ground, he fails to demonstrate that Defendants should have appreciated that. This was a rapidly evolving situation that lasted mere seconds. It was likely difficult for the Defendant Officers to get an accurate picture of how contained Gardner was in the few seconds they struggled on the ground in a tight and confined space. The Defendants could reasonably have misperceived the movements of other officers to subdue Gardner as Gardner attempting to continue resisting. The Defendants likewise could have reasonably misperceived Gardner's own natural body movements in response to efforts to maneuver him as Gardner still resisting. While hindsight might be 20/20, in the heat of the moment, it would have been difficult to know whether Gardner was subdued or not at that point given how this encounter unfolded.

Perhaps Sgt. Carter could have ordered Gardner to stand at that point to be handcuffed rather than deploy pepper spray. But nothing here about Gardner's demeanor or actions signaled that he was subdued or planned to comply and submit to handcuffing willingly. The videos depict an on-going struggle. And just prior, Gardner had stated emphatically that he would never accept

a cellmate and he had engaged in acts of physical resistance by swatting away the officers' arms and sliding to the floor. In any event, it is not the Court's job when deciding an Eighth Amendment claim to second-guess the reasonableness of a particular use of force or weigh alternatives. *Whitley*, 475 U.S. at 322; *see also Lee v. James*, No. 21-1114, 2021 WL 3197514, at *3 (7th Cir. July 29, 2021) ("the infliction of pain to maintain order is not excessive simply because the use of force in retrospect appears unnecessary"). The court also need not accept Gardner's hypothetical argument as fact. No one can know what amount of force would have been necessary "in the strict sense" to subdue him, but that is not the question before the court. *Whitley*, 475 U.S. at 319.

This leaves the injury factor. Of course, the exposure itself to pepper spray is quite painful. *See Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 726 (7th Cir. 2013). On the other hand, some of the routine lingering effects of pepper spray are not objectively serious conditions that even trigger Eighth Amendment claims regarding medical care. *See Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (the types of conditions associated with exposure to OC spray are generally considered "relatively minor."); *Oliver v. Deen*, 77 F.3d 156, 160-61 (7th Cir. 1996)) ("[B]reathing problems, chest pains, dizziness, sinus problems, headaches and a loss of energy...are, objectively speaking, relatively minor."). Here the fact that the ***sole*** physical injury to Gardner from this encounter was exposure to pepper spray (and its lingering effects), tips this factor in Defendants' favor. *See Soto*, 744 F.2d at 1262 ("Without exception, the institutional officials and officers were of the opinion that the use of mace was much more humane and effective than a flesh to flesh confrontation with an inmate."); *Smith v. Kind*, 140 F.4th 359, 369 (7th Cir. 2025) (many prisoners "may experience pepper spray as a relatively minor use of force.").

*2. Officer Parker's Strike to Gardner*

As set forth above, the videos depict that after Sgt. Carter gave the disengagement order, the officers then stepped back, Gardner stood up, and Officer Parker then swung his arm and struck Gardner once on the head, which caused Gardner to stumble back against the railing at the edge of the dayroom. Gardner states that this strike was a closed-fist punch to the face, which Gardner believes was unjustified. Dkt. 131, Pl.'s Resp. to Def. Parker ("PRESP3") ¶ 8. Parker denies that the video depicts a closed-fist punch or that the video depicts malicious intent. Dkt. 108, pg. 3-7; Dkt. 139-1, ¶ 8.

The video footage does not provide a clear enough view of Officer Parker's hand to determine how specifically he struck Gardner. Because the video evidence does not "firmly settle[ ]" this disputed question of material fact, the court applies regular rules of deference in favor of the non-movant, *Smith*, 140 F.4th at 363, and will accept at summary judgment Gardner's version that the strike was a closed-fist punch.

Accepting Plaintiff's version of the disputed facts, he has not provided evidence that a reasonable jury could rely on to conclude that Defendant Parker had a malicious and sadistic mindset to cause harm rather than an intent to maintain or restore discipline. At the time Officer Parker struck Gardner, he was still completely unrestrained and had never stopped resisting. And nothing about his demeanor or actions, even at the time of the "disengage order", signaled compliance. As the Officers disengaged, Garnder began to stand up, which Officer Parker certainly could have perceived as ongoing resistance and a threat. *See Stubblefield v. Jones*, 2015 WL

2128602, at *6 (N.D. Ill. May 5, 2015) ("It does not violate the Constitution to apply a minimal or modest amount of force to secure a defiant inmate") (citing *Guitron v. Paul,* 675 F.3d 1044, 1046 (7th Cir. 2012). Officer Parker's single strike was also limited in number and duration – his use of force ceased once Gardner was pushed back away from the Officers. The alleged punch also caused no physical injury. Taking into consideration all of the relevant factors and viewing the evidence in the light most favorable to Gardner, the court finds that Officer Parker's decision to deliver one closed-fist strike to push Gardner back so the officers could successfully disengage does not support "a reliable inference of wantonness" under the circumstances. *Whitley*, 475 U.S. at 322.

*3. Decontamination Efforts*

The Seventh Circuit has recognized that in certain circumstances an unjustifiable refusal to allow a prisoner to shower or wash off pepper spray can constitute excessive force that amounts to cruel and unusual punishment. *See Kervin v. Barnes*, 144 F. App'x 551, 552 (7th Cir. 2005) (citing with approval *Williams v. Benjamin,* 77 F.3d 756, 764–65 (4th Cir.1996) (concluding that exposure to pepper spray for eight hours while confined in four point restraints with no prior opportunity to wash it off may violate constitution) and differentiating *Jones v. Shields,* 207 F.3d 491, 493, 496 (8th Cir. 2000) (20-minute delay in decontamination did not violate constitution)). Because such a claim arises under the Eighth Amendment, the question presented is again one of intent: was the delay a willful and wanton infliction of pain by prison officials. *Kervin*, 144 F. App'x at 552.

Gardner's case differs from any that this Court has located where a court inferred wanton intent from a decontamination delay because in the present case the Officer Defendants did *not* delay attempting to decontaminate Gardner *nor* did they delay facilitating his medical attention thereafter. Rather, the Officer Defendants here *immediately* provided Gardner a decontamination shower and then *immediately* took Gardner to the dispensary. *Compare, e.g., Williams*, 77 F.3d at 764-65 (exposure to pepper spray for eight hours with no opportunity to wash it off while confined in four point restraints may violate constitution); *Mann v. Failey*, 578 Fed.Appx. 267, 273-74 (4th Cir. 2014) (concluding that exposure to pepper spray for four days without shower may violate constitution); *Nasseri v. City of Athens*, 373 F. App'x 15, 18 (11th Cir. 2010) (officers who confined pepper-sprayed inmate in a poorly-ventilated patrol car for an hour without permitting decontamination notwithstanding his complaints that he was having breathing problems, while allowing other detainees to use a hose outside the jail to spray themselves off, were not entitled to qualified immunity on excessive force claim); *Boyd v. Surguy*, No. 1:23-CV-02174-JPH-TAB, 2024 WL 1676792, at *1 (S.D. Ind. Apr. 17, 2024) (placing the plaintiff in a shower stall without working water and leaving him standing there for eight hours stated a claim); *Perigo v. Richert*, No. 22-CV-1540-RJD, 2025 WL 2256240, at *5 (S.D. Ill. Aug. 7, 2025) (finding that turning off the unit water after macing an inmate did not serve any legitimate non-punitive purpose and amounted to an unreasonable use of excessive force) (14th Amendment detainee context).

Gardner's complaint is that decontamination was ineffective, not that it was denied or delayed. He has testified that the water from the decontamination shower did not land on his face, and he was not able to flush his eyes with water until six hours later when he was assigned to a cell with a sink. The Court credits this testimony at summary judgment. This distinction from the

cited cases matters though, because, again, the question here is whether the Officer Defendants acted maliciously to prolong Gardner's exposure to the pepper spray.

The Court cannot reasonably draw that inference when the evidence is undisputed that the Officer Defendants decontaminated Gardner under a running shower for 25 seconds immediately after he was sprayed with pepper spray and then took him to the dispensary right away after that. *See, e.g., Stinson v. Anderson*, No. 23-CV-337-JDP, 2025 WL 993974, at *2 (W.D. Wis. Feb. 7, 2025) (malicious intent negated where officers transported asthmatic inmate to receive medical attention after they pepper sprayed him). Gardner did not describe that the Officer Defendants purposefully removed his head from the water stream or even that they were aware – in the unlit, dark shower area – of where the water had landed. He testified merely that when the Officers cut on the water, it hit his chest and below. The video shows that his uniform was wet all the way up to his neck, so the water fell at least in the close vicinity of Gardner's head, suggesting that it would not have been obvious that the water did not reach his face.

There were times during the post-incident events where Gardner complained directly to, or in the presence of, the Officer Defendants that his eyes were still burning. But he did not tell Defendants that the decontamination shower had missed his eyes altogether. The Court must draw reasonable inferences in Gardner's favor, but on this record it would be speculative to assume the Officer Defendants purposefully kept Gardner's head out of the water or understood Gardner to be complaining about more than just the residual burning from pepper spray after they had already decontaminated him. This is particularly true of Sgt. Carter who was not inside the shower area; he had no reason to believe his officers did not follow his order to decontaminate Gardner. Gardner's appearance during the post-incident interview is consistent with this as well. The officers' failure to take additional action on what sounded like complaints of residual effects is not a constitutional violation. *See Perigo v. Richert*, No. 22-CV-1540-RJD, 2025 WL 2256240, at *4 (S.D. Ill. Aug. 7, 2025) ("Unless the use of pepper spray aggravated an underlying condition, courts have routinely held that "the lingering effects of being pepper-sprayed or exposed to similar chemical agents are not objectively serious medical conditions.") (internal quotations and citation omitted). For example, when Gardner told Sgt. Carter that his eyes were still burning during the post-incident interview, Sgt. Carter responded that he had received a decontamination shower on the tier. And when he complained to the Officer Defendants after the shower, they told him they were taking him to receive medical attention and they brought him to the dispensary. The intent of the Officer Defendants is what matters – "not whether there were other steps they might have taken that were less intrusive." *See Jensen v. Budreau*, No. 20-CV-997-BBC, 2022 WL 1262137, at *6 (W.D. Wis. Apr. 28, 2022) (no constitutional violation where arrestee waited for transport to jail to decontaminate rather than being permitted to use supplies from the ambulance). And the Officers could not have bad intentions based on facts that the record does not tend to show they knew. *See generally Whitaker*, 144 F.4th at 924 ("Assuming that [the inmate] was unable to cooperate ... [Plaintiff] has not provided any evidence that [Defendant] could or should have appreciated that.").

* * *

Plaintiff had multiple opportunities to comply with officers' orders. He chose a course of conduct that required the use of some physical force. For all the reasons above, the Officer Defendants are entitled to summary judgment on Gardner's claim of excessive force. The Court

need not address their alternative argument on qualified immunity grounds.[3] Final judgment shall be entered in their favor.

*B. Medical Care Claim Against Nurse Smith*

"The Eighth Amendment's prohibition on cruel and unusual punishment protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including grossly inadequate medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019) (cleaned up). To prevail on a claim that his medical care violated the Eighth Amendment, Gardner must establish that: (1) he suffered from an objectively serious medical condition and (2) the defendant was deliberately indifferent to that condition. *See id.* at 1022 (citing *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)). The second prong, deliberate indifference, consists of more than negligence or malpractice; the defendant must know of and disregard an excessive risk to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Gardner's complaint with respect to Nurse Smith is that she failed to flush his eyes when he complained that they were burning from the pepper spray. But according to her medical record, Gardner was brought to the dispensary for evaluation for injuries following exposure to the pepper spray – not to be decontaminated. *See* Dkt. 114-1 at pg. 52. Inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible," *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The Eighth Amendment does not require that prisoners receive unqualified access to health care."). Here Nurse Smith did not ignore Gardner; she stopped and interacted with him and took his blood pressure. She assessed him as having no injuries other than residual burning and stinging from the spray (a point not in dispute). In other words, she assessed Gardner as having no objectively serious medical needs at the time. That a prisoner is suffering routine lingering effects from pepper spray, and wanted to clean himself further, does not constitute a serious medical need unless the effects aggravate an underlying condition. This is well-settled. *See Perigo v. Richert*, No. 22-cv-1540, 2025 WL 2256240 *4 (S.D. Ill. 2025); *Hamilton v. Gavin*, No. 22 C 02285, 2023 WL 2161663, at *6 (N.D. Ill. Feb. 22, 2023) ("injuries from mace do not constitute an objectively serious medical condition"); *Buchanan v. Pfister*, No. 17 CV 8075, 2018 WL 4699778, at *7 (N.D. Ill. Oct. 1, 2018) ("The courts have routinely held that the lingering effects of being pepper-sprayed or

[3] Some of the Officer Defendants also argue that Gardner failed to exhaust his administrative remedies on a "claim that Defendant Officers subjected him to excessive force when they secured him to a bench outside the dispensary for six hours." Dkt. 110-1, pg. 7-8. But Plaintiff's complaint did not seek to bring a separate claim specifically about being handcuffed outside the dispensary; nor has he ever suggested that the one-handed cuffing and time spent restrained in this manner on the bench was a separate incident of excessive force. Whether he exhausted a non-existent claim is irrelevant. Plaintiff's complaint instead raised a broader claim that his exposure to pepper spray was maliciously prolonged after the incident. As Gardner argues in his response, dkt. 133, pg. 12-15, the two grievances he taped and filed together about August 31, 2022, see dkt. 133, pg. 41-42, complained about both the use of pepper spray and its after effects, and therefore gave the Officer Defendants sufficient notice of a claim in this broader vein. As the Seventh Circuit has explained, the grievance and complaint need not match with surgical precision but rather must simply provide correctional officials "a fair opportunity to address his complaint." *Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011); *see also Kyles v. Beaugard*, No. 15-cv-8895, 2017 WL 4122708 (N.D. Ill. Sept. 18, 2017) (collecting cases for the proposition that a grievance does not fail to exhaust remedies if it is factually clear but does not explicitly name each defendant). The Court rejects any suggestion that the Officer Defendants might be making that Gardner's claims against them do not extend to his post-incident exposure.

exposed to similar chemical agents are not objectively serious medical conditions.") (collecting cases); *Foote v. Houi,* No. 03 CV 50001, 2004 WL 2901039, at *2 (N.D. Ill. Dec. 14, 2004) ("While [Plaintiff] experienced some obvious discomfort from coming in contact with pepper spray, he has not identified any serious medical condition that was either caused, or aggravated, by the spray").

And she did not disregard his complaint about his eyes; rather, according to her medical record, she instructed Gardner to relax so those symptoms would abate. (She also brought him a cup of water, but his eyes could not reach the water.) At this point Gardner had received a decontamination shower. Nurse Smith, like the Officer Defendants, did not have reason to believe that Gardner was complaining about anything more than residual burning, which is not an objectively serious medical need that triggers constitutional protection. Her response to complaints of an inmate that she understood had already been decontaminated does not rise to deliberate indifference. Deliberate indifference poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee Cty.*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc*., 982 F.3d 451, 458 (7th Cir. 2020)); *see also Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (stating that deliberate indifference claims will fail absent evidence of "callous disregard" for inmate wellbeing). That Nurse Smith might have been mistaken about the severity of the burning in Gardner's eyes is not enough to create liability; rather, the evidence needed to show that she disregard a need she *knew of*: "[n]egligence, or even objective recklessness, is insufficient to satisfy deliberate indifference." *Stockton*, 44 F.4th at 615.

Summary judgment shall be granted in favor of Nurse Smith. [4]

## Conclusion

Defendants Carter, Bracy, Parker, Medrano, Meraz, and Smith are entitled to summary judgment for the reasons discussed above. The Court therefore grants Defendants' motions for summary judgment [107] [110] [112]. The Court will address the Magistrate Judge's Report and Recommendation [124] via separate order. Final judgment will be entered in Defendants' favor. Civil case terminated.

---

[4] Because the summary-judgment briefing suggests some misapprehension on this point, the Court reiterates that Nurse Smith is the sole Defendant against whom the Court allowed Gardner's medical-care claim to proceed. Dkt. 88. The amended complaint referred to only Nurse Smith as having denied him medical care. Dkt. 89, ¶ 48. Gardner then separately claimed that the Officer Defendants acted "sadistically and maliciously" by failing to flush his eyes – which is a claim that sounds in excessive force. Dkt. 89, ¶ 50. *See Keller v. Sanchez,* No. 25-cv-712-MAB, 2025 WL 1734884, at *3 (S.D. Ill. June 23, 2025) (observing that the plaintiff's claim that he was refused a shower to wash off pepper spray was "better viewed as a generic cruel and unusual punishment claim" than deliberate indifference to serious medical needs).

E N T E R:

Dated: September 8, 2026

MARY M. ROWLAND
United States District Judge